[Crim. No. 1904.   Third Dist.   May 31, 1945.]

In re L. O. CASPERSON et al., on Habeas Corpus.

J. Thaddeus Cline, Clifton E. Brooks and Robert A. Zarick for Petitioners.

Robert W. Kenny, Attorney General, Ralph H. Cowing and Ariel C. Hilton, Deputies Attorney General, John Quincy Brown, District Attorney (Sacramento), and John B. Heinrich, Assistant District Attorney, for Respondent.

PEEK, J.—Two misdemeanor proceedings are involved in this controversy. In the first, petitioner L. O. Casperson was charged with the violation of section 1103 of the Agricultural Code in that he shipped into Sacramento county inedible eggs, while in the second action both L. O. and E. G. Casperson were charged jointly in two counts under said section. First, with shipping inedible eggs into Sacramento County, and second, with shipping mislabeled eggs into said county. The actions were consolidated for the purpose of trial, and at the conclusion thereof the petitioners were found guilty as alleged in both complaints. From such convictions they appealed to the appellate division of the superior court of said county, which sustained the judgments of conviction. By habeas corpus they now seek their discharge.

Both petitioners are members of the firm of O. Casperson & Sons of San Francisco, wholesale dealers in butter and eggs. They and three brothers actively operate and conduct the business of said partnership, of which L. O. Casperson is the managing director. The eggs were purchased by telephone from E. G. Casperson by Kay Wilson, a wholesale egg dealer of Sacramento, California. On or about November 4, 1943, Mr. F. E. Trimble, Agricultural Inspector of the County of Sacramento inspected the eggs involved in the first complaint and found 8.8 per cent of the entire lot to be inedible. On December 11, 1943, he inspected the eggs involved in the second complaint and found them to be mislabeled.

█ The first issue raised by petitioners is that there is no evidence in either proceeding establishing the guilt of L. O. Casperson, the general manager of the partnership, that the evidence admittedly discloses he had no personal knowledge of the particular transactions and that all negotiations relative to the sale of the eggs were carried on solely by E. G. Casperson. To this contention respondent replies that violation of pure food laws is an offense wherein no affirmative proof of criminal intent or guilty knowledge is required; that it is the act itself and not the intent that determines the guilt; that the distribution of food unfit for human consumption is an act potentially detrimental to human life and health, hence a dangerous act, and cannot be made innocent or harmless by the want of knowledge or good faith.

Petitioners, however, argue that the question of intent is of no consideration to the point so raised; that petitioner L. O. Casperson cannot be held merely because he was a partner of another who committed a violation of the statute, and in support of such contention rely upon the cases of *People* v. *Maljan,* 34 Cal.App. 384 [167 P. 547] and *People* v. *Schomig,* 74 Cal.App. 109 [239 P. 413].

The two cases so cited by petitioners are of no assistance to a determination of the questions herein raised. The first case held that a member of a partnership who feloniously converts to his own use funds which have come into his hands as a member of the partnership may be guilty of embezzlement— a crime wherein the word itself has a significant meaning and implies a fraudulent intent (10 Cal.Jur. 260), and obviously, therefore, the party charged must be the individual partner who converts the funds. In the second case the constitutionality of an act relating to real estate brokers was attacked, among other things, on the ground that it was discriminatory in that no penalty was provided for the violation thereof by a partnership. The court therein properly held that generally as regards criminal responsibility a partnership is not recognized as a person separate from its component members in the sense that a corporation is a separate entity, and therefore cannot commit a crime, but that guilt attaches to the delinquent members subject to certain qualifications.

With such statements of the law in relation to partnerships there can be no complaint. However, in the present case we are dealing with a so-called pure food law, where neither

intent nor knowledge are made essential elements of the crime, and therefore no showing in that regard need be made. Here the Legislature, under its broad police powers, has determined that ''It is unlawful to prepare, pack, place, deliver for shipment, place in storage, deliver for sale, store, load, ship, transport, or sell in bulk or in containers or subcontainers'' inedible or mislabeled eggs. (§ 1103.) From a reading of that portion of the act it is immediately apparent that the purpose of the Legislature in enacting the same was to absolutely prohibit the enumerated acts relating to inedible or mislabeled eggs, irrespective of the knowledge or intent of the person charged. Having so prohibited such acts and denounced them as criminal (§ 1107) the mere commission of the prohibited act, regardless of the intent or knowledge with which it was committed is sufficient to constitute the crime so denounced. (*People* v. *Pera*, 36 Cal.App. 292 [171 P. 1091]; 36 C.J.S. § 22, p. 1078.)

Such laws do not ''make a dealer liable for a crime committed by another, nor do they make him criminally responsible for accidents or deeds beyond his control, but they do hold him, criminally as well as civilly, accountable for the quality of the goods which he sells. If he undertakes to sell food for human (and in many cases other) uses he must sell pure and not adulterated food; that is his responsibility, fixed by law. . . . His act in selling food, if he voluntarily engages in that business, is deliberate, willful, intentional and knowing.'' (*People* v. *Schwartz*, 28 Cal.App.2dSupp. 775, 778 [70 P.2d 1017]; *Weigand* v. *District of Columbia*, 22 App.D.C. 559; *People* v. *Kibler*, 106 N.Y. 321 [12 N.E. 795].)

If the rule were otherwise, pure food laws would be of small consequence and no deterrent whatever to the commission of the acts similar to those with which petitioners herein are charged. As the court stated in *People* v. *Kibler*, *supra*, experience has taught the lesson that in regard to pure food laws repressive measures which depend for their efficiency upon proof of the dealer's intent and knowledge are of little use and rarely accomplish their purpose; that, therefore, under such circumstances, legislation which casts upon the dealer the entire responsibility for the purity of the article he offers for sale, is entirely justified.

We do not believe it was the legislative intent that a dealer should escape the prohibitions of the act by showing that a clerk made the sale, as in the Schwartz case, or that it was

unauthorized or without his knowledge. Nor can we believe the Legislature intended that partners could evade the act by a similar showing. Although our attention has been directed to no case wherein the precise point as regards a partnership has been directly passed upon in this state, it has been approved in some of the earlier decisions in other jurisdictions. (See *Whitton & Ford* v. *State,* 37 Miss. 379; *Robinson & Warren* v. *State,* 38 Ark. 641; *Waller* v. *State,* 38 Ark. 656; *Edgar* v. *State,* 45 Ark. 356; *Ellison* v. *Commonwealth,* (Ky.) 69 S.W. 765; *Bayles* v. *Newton,* 50 N.J.L. 549 [18 A. 77].)

To hold that a partner should be held liable only when the sale was made by him or in his presence, or with his knowledge or consent, would be to judicially establish a way of easy escape. Particularly would this be true when we consider the community of interest between the partners, and also, as in the present case, where the original order was placed by telephone thereby rendering the identification of the seller practically impossible if such evasion was desired. It, therefore, is obvious that to sustain petitioners' contention in this regard would be to completely nullify the act insofar as partners are concerned. (*Groff* v. *State,* 171 Ind. 547 [85 N.E. 769, 17 Ann. Cas. 133].)

Petitioners further contend that the sale or transfer of eggs between wholesalers, particularly where, as in the present case, the eggs were purchased ''as is,'' is not a public offense, even though the eggs may be inedible or mislabeled, in that the ''egg law is strictly a consumers' law,'' and that the argument of respondent which would have required the candling of the eggs in question by petitioners prior to the shipment to the wholesaler Wilson would have accomplished nothing, as he in turn likewise would have had to candle the eggs before selling them to a retailer. Petitioners then conclude that to so argue is to assume that the Legislature intended to place upon wholesalers frivolous and ridiculous burdens, and if this be true the provision is thereby unreasonable and invalid. We find no merit in this contention.

From the last quoted portion of section 1103 it is evident that the Legislature desired to cover the whole field from producer to consumer. It is likewise apparent that the Legislature wisely anticipated that the best and most effective method to insure good eggs, properly labeled, was to prohibit all of the enumerated acts in relation to inedible or mislabeled eggs as set forth in said section at every stage

from producer to consumer. (*People* v. *Wilson & Co.,* 138 Misc. 440 [246 N.Y.S. 111].) The act, therefore, is no more a consumers law than it is a producers, a wholesalers, or a retailers law. In other words, it is an act designed to keep every phase of the egg business free of inedible and mislabeled eggs.

No contention is made that the "as is" purchase of the eggs was because the eggs were not to be resold. Manifestly they were purchased for resale and ultimate consumption. Even if this were not true such argument would be of no avail to petitioners, for the act contains no exemptions or qualifications in this regard.

Petitioners' final contention involves the construction of two chapters of the Statutes of 1939 relating to the Agricultural Code. Prior to the 1939 session of the California Legislature, section 1103 of said code read as follows:

"It is unlawful to sell chicken eggs in containers or subcontainers unless each container and subcontainer is marked with the following:

(a) The full, correct and unabbreviated designation of size, followed by designation of quality, of the eggs therein according to the standards as prescribed in this article;

(b) The name and address of the producer, wholesaler, retailer or agent by or for whom the eggs were graded or packed." (Stats. 1937, ch. 709, p. 1984.)

Section 1104 of said code, prior to said session of the Legislature, contained the following provisions:

"It is unlawful to prepare, pack, place, deliver for shipment, place in storage, deliver for sale, store, load, ship, transport or sell, in bulk or in any container or subcontainer:

"(a) Eggs for human consumption: (1) which contain black spot, black rot, white rot, adherent yolk, bloody or green white, blood or embryo chicks; (2) or which were addled, moldy, filthy, decomposed, putrid, or otherwise unfit for human food.

"(b) Eggs which are mislabeled.

"(c) Eggs which are deceptively packed, placed, arranged or displayed.

"Eggs being delivered to a wholesaler in the State for candling, grading or storing are exempt from the provisions of this section.

"The owner or person in possession of eggs which are to be

used or disposed of as herein provided, or as provided in section 1103.2, must, upon the demand of any enforcing officer, give to such officer a sworn statement in writing made before a notary public specifying that the eggs were packed for such disposal.'' (Stats. 1937, ch. 709, p. 1985.)

At said session two bills were proposed. The first was introduced on January 13, 1939, and upon its introduction was designated as A.B. No. 599. It passed both houses of the Legislature, was approved by the Governor on May 25, 1939, was filed with the Secretary of State on May 26th, and became chapter 235, page 1493, of the Statutes of 1939. By its provisions the next to the last paragraph of said section 1104 was amended merely to include the additional exemption of eggs ''in the possession of'' a wholesaler.

The second bill was introduced on January 24, 1939, and was numbered A.B. 1664. After several amendments it likewise passed both the Assembly and Senate, was approved by the Governor on July 18th, was filed with the Secretary of State on July 22d, and became chapter 834, page 2413, of the Statutes of 1939. This bill was amendatory of numerous sections of said code, including sections 1103 and 1104 and changed the entire subject matter of the last mentioned section.

Although both bills were approved and chaptered as previously stated, chapter 834 is the only one which appears in the Agricultural Code; chapter 235 appears solely in the Statutes of 1939.

In support of their final contention petitioners argue that in any event the terms and provisions of sections 1103 and 1104 as amended by the two bills are in no way repugnant to each other and that an earlier statute is not repealed by a later enactment unless such an intention clearly appears in the language of the latter or if the two cannot be reconciled.

It is true that the repeal of statutes by implication is not favored (*Boyd* v. *Huntington*, 215 Cal. 473 [11 P.2d 383]; *Hammond* v. *McDonald*, 32 Cal.App.2d 187 [89 P.2d 407]), and that to overcome the presumption against repeal by implication the two acts ''must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation.'' (*Penziner* v. *West American Finance Co.*, 10 Cal.2d 160 [74 P.2d 252].) However, where such conditions

obtain, obviously an intention to repeal the prior act is necessarily implied. (*Mansfield* v. *Chambers,* 26 Cal.App. 499, 505 [147 P. 595].)

By the second bill, A.B. No. 1664, all reference to wholesalers as originally provided in section 1104 and as amended by the first bill, A.B. No. 599, was completely eliminated, so that the section as amended finally recites in its entirety that "It is unlawful to sell to retailers or consumers, eggs ungraded as to quality or size." The remaining portions of section 1104 as they stood prior to amendments and revisions by A.B. No. 1664 (excluding the exemption of wholesalers) are substantially incorporated in the amendments by said bill A.B. No. 1664, to section 1103.

In addition thereto section 10 of the last mentioned bill declares that "Section 1104 of said code is hereby amended to read as follows" and the section amended is then set forth as previously quoted. Apropos of this, section 24, article IV of the Constitution provides in part: "No law shall be revised or amended by reference to its title; but in such case the Act revised or section amended shall be reenacted and published at length as revised or amended." Under this provision it has been held that such an amendment operates as a repeal of those parts of the statute or section which are not specifically enacted. This court, in construing a similar question, stated:

"There is no shade of difference in meaning, under the rules governing the construction of statutes, between the 'revision' of a particular act, or a section thereof, 'to read as follows' and the 'amendment' of the same act or section 'to read as follows': In either case it is clear that the revising or amending act is intended as a substitute for the original statute or section, continuing in force that which is re-enacted and repealing what is omitted." (*Pierce* v. *County of Solano,* 62 Cal.App. 465, 469 [217 P. 545].) This court further held in the later case of *Shearer* v. *Flannery,* 68 Cal.App. 91, 94 [228 P. 549], that:

"Under the provisions of this section it is clear that the amendment of a statute or section operates as a repeal of those parts of the statute or section which are not re-enacted."

We are convinced that a reading of the two bills at once discloses that the Legislature originally desired to exempt

wholesalers from the provisions of the Agricultural Code; whether on the theory as contended by petitioner, that such provisions were for the benefit of the consuming public, is immaterial, for by the provisions of A. B. No. 1664, the Legislature formulated a new procedure complete in itself, for the protection of the consumer by eliminating all possibility of inedible or mislabeled eggs reaching the ultimate consumer. Therefore, by chapter 834, the earlier declaration of the Legislature expressed in chapter 235 was completely superseded by an entirely new and all inclusive expression of legislative intent upon such subject. As such it must prevail, and whatever was excluded from the previous enactment by said chapter 834 must be ignored. (*Penziner* v. *West American Finance Co., supra; Mack* v. *Jastro,* 126 Cal. 130 [58 P. 372].)

The writ is discharged and the petitioners are remanded.

Adams, P. J., and Thompson, J., concurred.